UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

JAMES W. GANN, JR.,                    )
                                       )
            Petitioner,                )
                                       )
v.                                     )        No.: 4:13-CV-71-HSM-CHS
                                       )
JERRY LESTER, Warden,                  )
                                       )
            Respondent.                )


## <u>MEMORANDUM OPINION</u>

In 2002, a jury in the Coffee County, Tennessee Circuit Court convicted James W. Gann,

Jr., ("Petitioner") of first degree premeditated murder, arson, and setting fire to personal

property. *State v. Gann*, 251 S.W.3d 446, 451 (Tenn. Crim. App. 2007). For these offenses,

Petitioner received sentences of life with the possibility of parole (first degree murder); six years

(arson); and two years (setting fire to personal property)—all set to be served consecutively to

one another. *Id*. Petitioner now brings this pro se petition and amended petition for a writ of

habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement under that

judgment of convictions [Docs. 1, 18].

Warden Jerry Lester has filed a response and a supplemental response to the petition

[Docs. 14, 19], in which he argues that relief is not warranted with respect to Petitioner's claims,

and in support of that argument, he has filed copies of the state court record [Doc 15, Notice of

Filing Documents, Addenda 1-4]. Petitioner has not replied to the response or supplemental

response, and the time for doing so has lapsed.

## I.    PROCEDURAL HISTORY

On October 26, 2007, Petitioner's convictions were affirmed on direct appeal by the Tennessee Court of Criminal Appeals (hereinafter "TCCA") and on April 7, 2008, the Tennessee Supreme Court denied his application for permission to appeal. *Id.,* 251 S.W.3d at 446.

On June 19, 2008, Petitioner challenged his convictions by filing a petition for post-conviction relief, followed by two amended petitions [Doc. 15, Add. 3, vol.1 pp. 1, 20, and 41[1]]. After holding an evidentiary hearing on the claims, the state post-conviction court denied the petitions [*Id.* at 68-71], and the TCCA affirmed the denial. *Gann v. State*, No. M2010-01944-CCA-R3-PC, 2012 WL 2870605 (Tenn. Crim. App. July 13, 2012), *perm. to app. denied* (Tenn. Nov. 20, 2012). No further appeal was granted. *Id.*

There followed this timely § 2254 habeas corpus application and amended application [Docs. 1 and 18].

## II.    FACTUAL BACKGROUND

The following factual recitation is taken from the Tennessee Court of Criminal Appeal's opinion summarizing the evidence presented at trial.

> On December 6, 2000, firefighters responding to a fire at the residence of the victim, Willard Morris, Jr., discovered the victim's body under a pile of blankets. The victim had been stabbed repeatedly, and his clothing had been stuffed with wrapping paper, newspaper, and receipts. The defendant, who was originally charged with first degree felony murder, first degree premeditated murder, especially aggravated robbery, and two counts of arson, was convicted of first degree premeditated murder, arson, and setting fire to personal property.
>
> The victim's mother, Linda Morris, testified that she last saw the victim alive on the evening of December 5, 2000. She and her husband visited briefly with the victim, who showed them a large

---

[1]    Bates stamp numbers are used in the state court record and, thus, page citations to the state court record contained in this memorandum opinion refer to the Bates stamp numbers.

amount of cash totaling at least $1,100, and left at approximately 9:30 p.m. According to Ms. Morris, the victim kept money in an encyclopedia and under a loose piece of carpeting in his house, but when she searched the house after the fire, she did not find any money in either location.

Tullahoma Fire Department Firefighter Jason Morgan responded to the fire at the victim's residence and used a digital thermal imaging camera to search for signs of life inside the structure and found none. According to Mr. Morgan, the house was a "complete wreck" with objects torn from the wall and thrown onto the floor, the shower curtain torn down, and furniture overturned. He found a large pile of quilts in the front room of the house. After the fire was under control, Mr. Morgan began a search for bodies and saw the victim's fingers protruding from the edge of the pile of blankets in the den. Mr. Morgan pulled back the blankets and saw that the victim's shirt was soaked with blood and that his clothing had been stuffed with paper. Officials from the State Fire Marshall's Office concluded that the fire began in the kitchen, where numerous items of clothing, some still on hangers, had been placed on top of the stove and inside the oven.

 Tullahoma Police Department Investigator Jason Ferrell led the investigation into the victim's death and seized a poster board and two pieces of toilet paper that contained blood drops and smears as well as a tuft of "light blondish-brown hair" that was in the victim's hand. As he was collecting evidence from the scene, Ferrell received a telephone call from Timmy Brawley, who stated that he had important information regarding the victim's death. Ferrell met with Brawley, and Brawley agreed to wear a wire and meet the defendant at his residence. Ferrell recalled that he listened to the conversation but admitted that parts of it were distorted. Ferrell specifically recalled that the defendant told Brawley that his wife had scratched his cheek and poked him in the eye. At some point, the defendant got into a vehicle with Brawley, and the police stopped the vehicle. The defendant agreed to come to the police station for questioning and traveled there in Brawley's car. Ferrell stated that he continued to listen to the conversation between the defendant and Brawley. According to Ferrell, the defendant told Brawley, "We are the only alibi that each other's got." Brawley responded, "I'm telling the truth."

 At the police station, the defendant waived his rights in writing and provided a statement in which he admitted smoking crack cocaine with the victim and Brawley at the victim's residence. He stated that he left the victim's residence at approximately 4:30 a.m. The defendant also told Ferrell that his blood would not be found

Case 4:13-cv-00071-HSM-CHS   Document 24   Filed 09/07/16   Page 3 of 26   PageID #: 118

at the victim's residence. The defendant said nothing about an altercation with the victim or about the presence of others who might have attacked the victim. He stated that after leaving the victim's residence he walked to a cab stand, but when he could not get a cab, he walked to the Favorite Market and called a cab. The cab picked him up and drove him home. The defendant claimed that he received the scratches on his hands while he was running from police on a prior occasion. After the defendant gave his statement, Ferrell transported him to the hospital where blood was drawn for deoxyribonucleic acid ("DNA") testing. Ferrell explained that, because of the delay in receiving test results from the Tennessee Bureau of Investigation ("TBI"), the defendant was not arrested until he was indicted in January 2002.

Timmy Brawley, who had known the defendant for four or five years at the time of the victim's death, testified that on December 5, 2000, he and the defendant drove to two different locations in an unsuccessful attempt to purchase marijuana before driving to the victim's house to purchase cocaine. Brawley and the defendant purchased cocaine and left the victim's house at approximately 4:00 p.m. They then went to Brawley's house and injected the cocaine before traveling to Nashville in search of more drugs. While in Nashville, the two men purchased Dilauded and cocaine which they dissolved in water and injected before returning to Brawley's residence. There, they injected more cocaine and then traveled to the victim's residence. The defendant told Brawley to park next door and wait outside. Brawley waited thirty to forty-five minutes and then went to the front door. At that point, the defendant came to the door, told Brawley that the victim had agreed to "front him an eightball of cocaine," and instructed Brawley to go purchase cigarettes for the victim. When Brawley returned, the victim and defendant were cooking crack cocaine in the kitchen of the victim's residence. Thereafter, the three men "smoked a lot of cocaine." According to Brawley, the victim and the defendant argued about money, with the victim refusing to front any cocaine to the defendant. The victim did, however, offer to allow them to smoke all of the crack cocaine that he had in the house.

Brawley recalled that when he left the victim's residence at 3:45 a.m., the victim and the defendant were in the kitchen with a large amount of cocaine. At that time, the defendant was wearing baggy pants, a t-shirt, tennis shoes, and a blue flannel jacket that he had borrowed from Brawley on the previous day. Brawley returned to his residence, showered, drove his wife to work, and then drove his children to school. As he was driving to work later in the morning, he saw police at the victim's residence and observed that the house

was on fire. Thereafter, he contacted Ferrell, who asked him to wear a wire and go to the defendant's house to retrieve the blue flannel jacket. Brawley admitted that he did not contact Ferrell until after he learned that the victim was dead. Brawley claimed that the defendant asked him to tell police that he had left the victim's residence with Brawley.

Seventeen-year-old Michael Kyle McKay, who lived across the street from the victim, testified that at approximately 7:45 a.m. on December 6, 2000, he saw a man carrying a garbage bag leave the victim's house and walk down the street. The man looked over his shoulder at the victim's house several times but did not appear to be in a hurry. He was approximately five feet, four inches tall and, because of his slim build and shoulder-length hair, McKay initially believed he was a woman. McKay recalled that the man was wearing navy blue or faded black sweat pants, a red and black checked shirt, and a navy blue toboggan. Upon viewing a photographic lineup, McKay identified the defendant as the man he had seen leaving the victim's house.

Doctor Feng Li, who performed the autopsy, testified that the victim had a of total 77 stab wounds in addition to a number of blunt force trauma injuries. The victim had 15 stab wounds to the head and neck, 16 to the left side of the chest, four to the right chest, six to the abdomen, one to the right shoulder, one to the left thigh, and 34 to the back. At least one of the stab wounds penetrated the victim's heart and seven penetrated the lungs. Doctor Li testified that many of the wounds were likely inflicted after the victim lost consciousness and some after he had died. The cause of death was multiple stab wounds. Wounds to the victim's hands and arms were classified as defensive wounds. The victim's urine tested positive for cocaine and marijuana.

Scott Robinson, a driver for Courtesy Cab, testified that he picked the defendant up at Scot Market at 8:31 a.m. on December 6, 2000. He recalled that the defendant had long hair and acted completely normal.

Kristen Brazier, the defendant's girlfriend and mother of his three children, testified that the defendant left their residence on the evening of December 5, 2000, and returned at approximately 8:00 a.m. the following morning. Ms. Brazier, who was declared a hostile witness, admitted giving a statement to police that the defendant "had gashes on his hands, his thumb cut, and had a gash on his head. His scalp was busted." She also told police that the defendant claimed that he received the injuries in a fight in Nashville. The defendant did not appear upset or distraught when

he discussed his injuries. On cross-examination, Ms. Brazier stated that the defendant had the cut on his head before he left on December 5. She claimed that she gave her statement to police only because she felt pressured by police.

Special Agent Joseph P. Minor of the TBI performed DNA testing on the items collected from the scene. According to Agent Minor, the defendant's blood was found on a piece of poster board found underneath the victim's body and a calendar found in the front room of the victim's house. Blood on a piece of toilet paper was a mixture from the defendant and the victim.

The defendant, who was 19 years old at the time of the crimes, testified that he was a heavy drug user during that time and that the victim was his usual supplier of cocaine. He stated that on December 5, 2000, he left his residence with Brawley in search of drugs. After unsuccessful attempts to purchase marijuana and cocaine elsewhere, he and Brawley bought cocaine from the victim. They injected the drugs at Brawley's house and then traveled to Nashville, where they purchased Dilaudid using clothing that Brawley had shoplifted. While in Nashville, the defendant injected both cocaine and Dilaudid. The two men then went to Brawley's house, where they injected more drugs before traveling to the victim's house to purchase more cocaine. While at the victim's residence, the defendant and Brawley smoked crack cocaine and agreed to split the purchase of an eightball. The victim sent Brawley for cigarettes, and he was gone thirty to forty-five minutes. The defendant contended that after he heard a car pull into the driveway, he went into the bathroom and vomited. He claimed that as he was cleaning himself up, he heard the sounds of a struggle coming from the front room of the house. When he came out of the bathroom, he saw Brawley and the victim fighting and observed Brawley "sticking" the victim. The defendant claimed that he was knocked unconscious when he tried to intervene in the melee.

When he regained consciousness, the defendant was lying on the floor and paper had been stuffed into his clothing. The defendant stated that he got up, pulled the paper out of his clothing, and "hit the door wide open." Although he saw the victim lying on the floor and saw and smelled smoke, he did not check to see if the victim was alive and did not attempt to offer any assistance. The defendant stated that he did not provide this information to police because he was sick and sleepy from ingesting Dilauded just prior to the interview. When asked why he did not get stabbed, the defendant stated that he heard someone say, "Just let him burn."

6

During cross-examination, the defendant said that he ran from the victim's house to Scot Market and stated that he did not call the fire department or the police because he felt as though he was "running for [his] life." The defendant could not explain how his blood came to be on the items seized from the victim's residence or how he had received the numerous scratches to his face and hands. He admitted lying to police about the origin of his injuries, explaining that he was scared.

Tammy Smith, a third-shift clerk at Scot Market, recalled that around 4:30 a.m., a white man with "scraggly hair," dark pants, a white t-shirt, and a blue checked shirt entered the store and told her he was waiting for a ride home to Shelbyville. The man, who she said "could have been" the defendant, was wearing work boots and had no injuries on his hands or face. Another clerk, Katie Ferrell, disagreed with Smith's description of the man from Shelbyville and described him as tall with broad shoulders and shoulder length dark hair.

At the conclusion of the trial, the jury returned verdicts of guilty for first degree premeditated murder, arson, and setting fire to personal property. The jury acquitted the defendant of especially aggravated robbery and felony murder.

*State v. Gann*, 251 S.W.2d at 451-55.

## III. DISCUSSION

Petitioner raises four grounds in his § 2254 petition (Grounds I – IV) and seven grounds in his amended petition (Grounds 1 -7), for a total of eleven grounds [Docs. 1 and 18].[2]

1. The TCCA abused its discretion in affirming the trial court's judgment.

2. The State violated Rule 28 section (5)(G) of the Post-Conviction Procedures Act by not responding to each claim raised in the post-conviction petition and amended petition.

3. [Petitioner] received ineffective assistance of counsel.

4. The post-conviction court erred, violating R. 28 Sec. (9)(A) and T.C.A. [§] 40-30-

---

[2] Petitioner used Roman numerals to list the grounds in the petition, but he used Arabic numbers to list the grounds in the amended petition. For the sake of clarity and consistency, some grounds have been restated and all grounds have been renumbered using Arabic numbers.

118(b), by failing to issue an order, stating specific findings of fact and conclusions of law as to each issue presented.

5. The lack of contact between Petitioner and his counsel constituted ineffective assistance of counsel.

6. Counsel's failure to investigate and review evidence against Petitioner constituted ineffective assistance.

7. Counsel's failure to file a pretrial motion to suppress evidence constituted ineffective assistance.

8. Counsel's failure to request specific curative instructions after objections were sustained constituted ineffective assistance.

9. Counsel's failure to object to closing arguments constituted ineffective assistance.

10. The trial court deprived Petitioner of his constitutional rights by failing to cure the prosecutorial misconduct that occurred before the jury and in the presence of the court during the trial.

11. Prosecutorial misconduct violated Petitioner's right to a fair trial.

The Warden argues that the four grounds asserted in the petition are not cognizable; insufficiently pleaded; or are barred by state procedural defaults. The Warden also argues that Grounds 5 through 9 in the amended petition relate back to Ground 3 in the petition. Though Ground 3 was insufficiently pleaded in the petition, Respondent takes the position that Grounds 5 - 9, which provide the factual content missing from the general claim of ineffective assistance offered as Ground 3, fairly can be considered to be sub-claims of Ground 3.

The Warden further argues that, even if the Court construes the claims of ineffective assistance raised in the amended petition as being the same claims presented to the state courts during post-conviction proceedings, those claims warrant no habeas corpus relief, given the deferential review of state court decisions on adjudicated claims which 28 U.S.C. § 2244(d) requires. As to the last two Grounds (Grounds 10 – 11 in the amended petition), which contain

claims involving prosecutorial misconduct during the closing argument, the Warden first suggests that the claims are insufficiently pleaded. The Warden further suggests that, since counsel did not object to the prosecutor's closing argument to the trial court, the TCCA reviewed the claim on direct appeal only for plain error and that a plain error review is a type of judicial review which amounts to a procedural default.

The Court agrees with Respondent Warden concerning Petitioner's entitlement to habeas corpus relief and, for the reasons which follow, will **DENY** the petition and **DISMISS** this case.

The claims have been grouped into different categories for purposes of discussion: non-cognizable/ insufficiently pleaded claims, adjudicated claims, and procedurally defaulted claims,

## A. Non-Cognizable/ Insufficiently Pleaded Claims

### 1. Abuse of Discretion (Ground 1)

Petitioner maintains that the TCCA abused its discretion in affirming the trial court's judgment. Petitioner furnishes no supporting contentions of fact to flesh out his claim. Because Petitioner does not explain how the TCCA's affirmance of the judgment was an abuse of the discretion it was afforded, his claim is conclusory. Bare, conclusory allegations, unsupported by facts, cannot establish a constitutional violation. *Lynott v. Story*, 929 F.2d 228, 232 (6th Cir. 1991).

Furthermore, Petitioner does not point to the constitutional right which was violated by the TCCA's alleged abuse of discretion. A state court's abuse of discretion, without more, does not present a constitutional issue. *Williams v. Borg,* 139 F.3d 737, 740 (9th Cir. 1998) (finding that federal habeas review is limited to whether there was a constitutional violation and does not extend to whether a state court abused its discretion); *Sinistaj v. Burt*, 66 F.3d 804, 808 (6th Cir. 1995) ("[W]e can conceive of no situation in which a federal judicial determination on *habeas*

collateral review that a state court, as a matter of general law, abused its discretion in denying the withdrawal motion is *therefore* a violation of the federal Constitution.") (italics in original).

Additionally, an assertion that the TCCA abused the discretion granted it under state law involves solely an issue of state law. *See e.g., Sneed v. Donahue*, 993 F.2d 1239, 1244 (6th Cir. 1993) (assertion that sentences were aggregated under state law causing an illegal total sentence is not a cognizable habeas corpus claim); *Howard v. White*, 76 Fed. App'x. 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only.").

Because this claim does not allege a violation of federal constitutional law, it provides no cognizable basis for habeas corpus relief. 28 U.S.C. § 2254(a) (habeas corpus relief is appropriate only for constitutional violations); *see Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (claims which allege a state law error or an incorrect application of state law do not present cognizable issues for federal habeas review); *Pulley v. Harris,* 465 U.S. 37, 41 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").

## 2. Post-Conviction Errors (Grounds 2 and 4)

Petitioner maintains that the State violated a post-conviction procedural rule by failing to respond to each claim asserted in his post-conviction petition and amended petition and that the post-conviction court violated state law by failing to issue an order, stating specific findings of fact and conclusions of law as to each issue presented. Petitioner has failed to state a cognizable federal claim.

There is no constitutional requirement that states provide an appeal process for criminal defendants seeking to review alleged trial court errors. *Evitts v. Lucey*, 469 U.S. 387, 393 (1985). Nor is there a constitutional duty to provide for post-conviction relief

since "[p]ostconviction relief is even further removed from the criminal trial than is discretionary direct review," as "[i]t is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature." *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987) (citation omitted).

Thus, Petitioner's assertions with regard to the State's inadequate response to his post-conviction claims and to the inadequacies in the post-conviction court's opinion are not cognizable habeas corpus claims. *Kirby v. Dutton*, 794 F.2d 245, 246 (6th Cir. 1986) (finding that claims involving constitutional violations during post-conviction proceedings did not relate to a prisoner's detention and, therefore, were not cognizable under § 2254); *see also Cress v. Palmer*, 484 F.3d844, 853 (6th Cir. 2007) ("[T]he Sixth Circuit has consistently held that errors in post-conviction proceedings are outside the scope of federal habeas corpus review.") (citing *Kirby*, 794 F.2d at 247). Additionally, whether a state court opinion contains findings of fact and conclusions of law is not a matter on which this habeas Court may sit in judgment. *Harrington v. Richter*, 562 U.S. 86, 99 (2011) ("Opinion-writing practices in state courts are influenced by considerations other than avoiding scrutiny by collateral attack in federal court.").

## B. Adjudicated Claims

Petitioner asserts that the TCCA erred in denying his claims of ineffective assistance of counsel.

### 1. Standard of Review

Adjudicated claims are evaluated under the review standards contained in the Antiterrorism and Effective Death Penalty Act (AEDPA), codified in 28 U.S.C. § 2241, which instruct a court considering a habeas claim to defer to any decision by a state court concerning the claim unless the state court's judgment (1) "resulted in a decision that was contrary to, or

11

involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies the principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

The AEDPA standard is a high standard to satisfy. *Montgomery v. Bobby*, 654 F.3d 668, 676 (6th Cir. 2011) (noting that "§ 2254(d), as amended by AEDPA, is a purposefully demanding standard . . . 'because it was meant to be'") (quoting *Harrington*, 562 U.S. at 102). AEDPA prevents the use of "federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." *Renico v. Lett*, 559 U.S. 766, 779 (2010). Further, findings of fact which are sustained by the record are entitled to a presumption of correctness—a presumption which may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### 2. Governing Legal Rules on Ineffective Assistance of Counsel Claims

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the

accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. VI. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

*Id.*

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Id.* at 688. A petitioner asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id.* at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). Thus, it is strongly presumed that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

When considering *Strickland*'s second prong, a petitioner must show a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine

13

confidence in the outcome." *Id.* "That requires a substantial, not just conceivable, likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (citation and internal quotation marks omitted).

Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992). Yet, the core inquiry remains "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

Finally, a petitioner asserting claims of "ineffective assistance of counsel under *Strickland* have a heavy burden of proof." *Whiting v. Burt*, 395 F.3d 602, 617 (6th Cir. 2005). "[W]hen a federal court reviews an ineffective-assistance claim brought by a state prisoner, the question is not simply whether counsel's actions were reasonable, 'but whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.'" *McGowan v. Burt*, 788 F.3d 510, 515 (6th Cir. 2015) (quoting *Harrington*, 562 U.S. at 105). Moreover, because AEDPA applies, this Court's evaluation of the TCCA's decision on the ineffective assistance claims is "'doubly deferential' . . . that gives both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 134 S. Ct. 10, 13 (2013) (quoting *Cullen*, 563 U.S. at 190).

### 3. Claims of Ineffective Assistance of Counsel (Grounds 3, 5-9)

According to a broad construction of Petitioner's allegations, the lack of contact with counsel, along which counsel's failure to investigate and review evidence against him; to file a pretrial motion to suppress evidence; to request specific curative instructions after objections were sustained; and to object to closing arguments warrant issuance of the writ because the

TCCA's unfavorable decision on his Sixth Amendment claims of ineffective assistance was contrary to and an unreasonable application of the governing rule in Supreme Court cases.

While pointing out that these claims are supported by no allegations of fact and, thus, are insufficiently pleaded, Respondent has interpreted Petitioner's allegations as encompassing the same claims of ineffective assistance asserted in the TCCA during his post-conviction appeal. The Court will follow suit. *See Franklin v. Rose*, 765 F.2d 82, 85 (6th Cir. 1985) ("The allegations of a pro se habeas petition, though vague and conclusory, are entitled to liberal construction[,] [and t]he appropriate liberal construction requires active interpretation in some cases to construe a pro se petition to encompass any allegation stating federal relief.") (internal quotation marks and citations omitted).

### a.    Lack of Communication and Contact

The first instance of ineffective assistance presented to the TCCA was Petitioner's contention that counsel failed to maintain adequate communication with him. The TCCA initially pointed out that, under *Strickland*, Petitioner's success on all his claims of ineffective assistance would depend on whether he could prove "both that counsel's performance was deficient and that the deficiency prejudiced the defense." *Gann v. State*, No. M2010-01944-CCA-R3PC, 2012 WL 2870605, at *5 (Tenn. Crim. App. July 13, 2012) (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996), which in turn cited *Strickland*, 466 U.S. at 687)). The TCCA then iterated the post-conviction court's findings that "trial counsel maintained sufficient contact with the petitioner, noting that trial counsel visited the petitioner at the jail and the penitentiary and that he had multiple meetings with the petitioner shortly before trial." *Gann*, 2012 WL 2870605, at *6. The TCCA did not grant relief on this claim.

The state court cited to *Strickland*'s two-pronged test for evaluating Petitioner's

ineffective assistance claim and therefore, its decisions with respect to the instant claim and to all other claims of ineffective assistance are not contrary to the controlling legal rule in Supreme Court cases. The question therefore is whether the TCCA's decision on Petitioner's first claim of ineffective assistance and all remaining ineffective assistance claims was an unreasonable application of *Strickland*.

In resolving this specific claim, the TCCA relied on the post-conviction court's factual findings that counsel visited Petitioner at the jail and the state prison that that counsel met multiple times with Petitioner. Those findings are entitled to a presumption of correctness absent clear and convicting contrary evidence. No such evidence has been adduced by Petitioner. Therefore, based on these undisputed factual findings, the Court concludes that the TCCA's rejection of this ineffective assistance claim decision was not an unreasonable application of *Strickland*.

### b. Failure to Investigate and Review Evidence

In the TCCA, Petitioner alleged that he received ineffective assistance in that counsel failed to obtain an audible copy of his audiotaped conversation with a witness.

In addressing this claim, the TCCA observed that "[r]egarding the audiotape of the petitioner's conversation with Brawley, the post-conviction court noted that during trial, trial counsel was provided with a transcribed copy of the recording and was allotted time to review it." *Gann,* 2012 WL 2870605, at *5.

The post-conviction court's finding that counsel "reviewed the tape once it was transcribed" requires further clarification. A review of the state court record reflects that, when defense counsels complained that the majority of the audiotaped recordings of the conversation which they had been provided by the prosecution consisted of static and that they had been

unable to hear anything audible on the tapes, they were permitted, during an overnight recess, to listen to the tapes, on special equipment provided by the prosecutor, who had assured the trial court that "there is no transcript of the tape" [Doc. 15, Add. 1, vol. 2 pp. 289-297; Add. 1, vol. 4 pp. 450-56; Add. 3, vol. 2 p.1403]. The trial transcript shows that the investigating officer listened to the audiotapes, made written notes of the conversation, and used those notes to refresh his memory while offering testimony; that there was a "typed version" of those notes; and that the defense was supplied with the typed version of the officer's notes [Doc. 15, Add. 1, vol. 4 pp 449-56].

The trial transcript controverts Petitioner's allegation that his counsel failed to investigate and review the audiotaped conversation between himself and Mr. Brawley. In addition, the trial transcript discloses that counsel conducted a vigorous cross-examination of the officer who testified as to the contents of the audiotaped conversation [Doc. 15, Add. 4, vol. 2 pp. 525-529].

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. Petitioner has not alleged, nor could he show, that he suffered any prejudice from his counsel's alleged error in failing to obtain an audible copy of the audiotaped conversation, given that counsel not only reviewed the audiotapes (though they did so during the trial) but that they also engaged in cross-examination of the officer who was responsible for having the conversation recorded and whose typed notes they were provided prior to his cross-examination.

Absent some showing of prejudice, the TCCA's rejection of Petitioner's claimed attorney error as not prejudicial and not in violation of his right to receive reasonably effective assistance of counsel was not an unreasonable application of *Strickland*. The Court's conclusion would be

the same under de novo review if, due to the fact that the trial transcript shows that counsel was provided a typed copy of the officer's notes and not a transcription of the audiotape, the deferential standards under AEDPA were not required.

### c.  Failure to File a Pretrial Motion to Suppress

In the TCCA, Petitioner claimed that his counsels should have but failed to file a motion seeking to suppress the "intoxicated statement" he made to police [Doc. 15, Add. 4, doc. 1 p.1533].  The TCCA observed that the post-conviction court accredited counsels' testimony involving the discussions they had about the statement their client gave the police.  Noting that the lower state court iterated that counsels had determined that their client was coherent when he gave the statement before the lower state court went on to find that counsels had made a tactical decision not to challenge the statement, the TCCA itself concluded that Petitioner had failed to establish that his counsels gave him ineffective assistance, and it too declined to grant him relief.

The finding that counsels discussed the statement and made a strategic decision not to pursue this line of defense is supported by the state court record [Doc. 15, Add. 3, vol. 2 pp. 1394-95, 1478-81].  According to the Supreme Court, strategic decisions are especially difficult for a petitioner to attack.  *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . .").

At any rate, given the presumption that counsel's challenged conduct must be considered sound trial strategy, as well as the difficulty encountered by a petitioner in challenging counsel's tactical decisions, the Court finds that Petitioner has not established that the TCCA's rejection of this claim was an unreasonable application of *Strickland*.  *Hanna v. Ishee*, 694 F.3d 596, 612 (6th Cir. 2012) ("The burden rests on the [petitioner] to overcome the presumption that the

Case 4:13-cv-00071-HSM-CHS   Document 24   Filed 09/07/16   Page 18 of 26   PageID #: 133

challenged conduct might be considered sound trial strategy.") (citing *Strickland*, 466 U.S. at 689).

### e.       Failure to Request Curative Instructions

Petitioner asserts that his counsels were ineffective for failing to request specific curative instructions to the jury after their objections were sustained.   Petitioner has not identified the objectionable statements for which counsel should have sought curative instructions, nor did he do so in his post-conviction appellate brief [Doc. 15, Add. 4, doc. 1 p.1533 (arguing that the record demonstrates five instances where counsel's objections were sustained but no curative instructions requested)].   Seemingly, Petitioner has offered this habeas claim in a vacuum, where no facts dwell.

Even so, it remains that Petitioner raised this same barebones claim in his state post-conviction appeal.   The TCCA initially addressed the claim by relating that trial counsel testified at the post-conviction evidentiary hearing that he did not request curative instructions because the trial court told the jury that they should disregard the statements to which he had objected. The TCCA added:

> Regarding trial counsel's failure to request curative jury instructions, the post-conviction court noted that the trial court "properly instructed the jury to disregard statements made by counsel not supported by the evidence [and] also gave the instruction concerning objections and rulings by the [trial court]." The post-conviction court stated that the trial court instructed the jury that when evidence did not support statements made by trial counsel, the jury was to disregard those statements.

*Gann,* 2012 WL 2870605, at *6.  Concluding that Petitioner had failed to establish that his trial counsel was ineffective, the TCCA declined to grant relief.

To prevail on a claim of ineffective assistance for counsel's failure to request a curative instruction, a petitioner would need to show prejudice by demonstrating a reasonable probability

19

that the omission of such instruction affected the outcome of the trial. *Shafer v. Wilson*, 364 F. App'x 940, 951 (6th Cir. 2010) (finding no prejudice "given the unlikelihood that the omission of such instruction affected the outcome of the trial"). Absent some showing of prejudice, the TCCA's rejection of Petitioner's claimed attorney error was not an unreasonable application of *Strickland*. *Berghuis v. Thompkins*, 560 U.S. 370, 391 (2010) (assuming that counsel's failure to request a limiting instruction was deficient representation, but finding no prejudice in light of the other evidence of guilt).

### d. Failure to object to closing argument

Petitioner claims that his counsels failed to object to the closing arguments of the District Attorney, which constitutes ineffective assistance. Petitioner has not identified the prosecutor's arguments made in closing to which counsels should have objected but to which they did not object. In Petitioner's post-conviction appellate brief, Petitioner argued that, during his direct appeal, the TCCA had held that the prosecutor's arguments were improper and intentional; that they constituted prosecutorial misconduct; and that counsel had not interposed any objection, even though had objections been made, the misconduct would have warranted a new trial [Doc. 15, Add. 4, doc. 1 p.1534].

In reviewing the claim, the TCCA acknowledged that it had concluded that the prosecutor's comments "were improper, inflammatory, and utterly indefensible as they violate nearly every rule established for proper closing argument," [and] "that no reasonable attorney would have failed to object out of simple inadvertence or neglect." *Gann*, 2012 WL 2870605, at *6 (citing *Gann*, 251 S.W.3d at 464). The TCCA continued that it had also recognized, in its direct appeal opinion, the possibility "that the argument was so outrageous that the prosecutor lost more credibility than he gained" and that "[i]f that were the case, then the failure to object

could have been a reasonable tactical decision." *Gann*, 2012 WL 2870605, at *6-7.

The TCCA iterated that co-counsel stated at the post-conviction hearing that, while she regretted not objecting when the prosecutor compared her client to "Charles Manson," she thought the outrageousness of the argument possibly hurt the prosecutor's credibility. *Id.*, 2012 WL 2870605, at *4. Lead counsel testified that he did not object because he believed the comparison between his client and Manson to be inapt and clearly outrageous and the prosecutor's closing argument to be so egregious that it may have turned the jury against the prosecution. *Id.*, 2012 WL 2870605, at *5.

The TCCA then pointed to the post-conviction court's findings that counsel made a strategic decision not to object to the prosecutor's closing argument and that Petitioner sustained no prejudice as a result of counsel's alleged error, in view of the overwhelming evidence presented against him at trial. *Id.*, 2012 WL 2870605, at *7. The TCCA determined that Petitioner failed to establish that his trial counsel was ineffective, and it did not grant relief.

Petitioner has a right to effective assistance during closing arguments, and deference to counsel's tactical decisions "is particularly important because of the broad range of legitimate defense strategy at that stage." *Yarborough v. Gentry,* 540 U.S. 1, 5-6 (2003). Petitioner can establish that he received ineffective assistance of counsel if he shows that counsel's failure to object was "both objectively unreasonable and prejudicial." *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010).

As discussed earlier, *Strickland* teaches that counsel's strategic decisions are difficult to attack. Here, both co-counsel and counsel believed that the prosecutor's egregious comments were so outrageous that they would offend the jury and would turn the jury against the prosecutor and, thus, would redound to their client's benefit [Doc. 15, Add. 3, vol. 2 pp. 1430,

21

1506-08].  Similar trial strategy has been effected by other defense counsel.  *See Darden v.*
*Wainwright*, 477 U.S. 168, 182-83 n.14 (1986) (counsel explained that he made a tactical
decision not to object to the prosecutors' improper comments since, based on his experience with
the prosecutor, counsel knew the prosecutor would "get much more vehement in his remarks"
and hopefully would commit a reversible error).  Petitioner has presented nothing here to
overcome the presumption that counsel's strategic decision was not reasonable.

A trial is not rendered unfair where prosecutors' closing argument is turned against them
in such a way as "to engender strong disapproval [rather] than [to] result in inflamed passions
against petitioner."  *Id*. at 182.  Furthermore, the state courts noted (and the state court record
demonstrates) that the evidence presented against Petitioner was weighty.  *See id.* (stating that
substantial evidence against a petitioner reduced the likelihood that a jury's decision was
influenced by an improper closing argument).  Given the weight and amount of the evidence of
guilt, and the double deference owed to the state court's decision on this Sixth Amendment
claim, it was not unreasonable for the TCCA to determine that Petitioner did not show that he
received ineffective assistance of counsel.  *Harrington v. Richter*, 562 U.S. 86, 112 (2011)
(finding that *Strickland* prejudice requires that "[t]he likelihood of a different result must be
substantial, not just conceivable").

### C.      Procedurally Defaulted Claims

Respondent Warden maintains that Grounds 11 and 12 have been procedurally defaulted
and that the purported procedural default of those grounds now bars federal habeas corpus
review.

A state prisoner must exhaust all constitutional claims by fully and fairly presenting them
in state court before a federal court can consider them in a habeas proceeding.   28 U.S.C. §

2254(b)(1)(A), (C).  A petitioner commits a procedural default by failing to raise a federal claim first in a state court or by failing to raise it at the proper time, both of which failings bar habeas corpus relief, unless that petitioner can show cause to excuse his default and prejudice as a result of the alleged constitutional violation.  *See Coleman v. Thompson,* 501 U.S. 722, 752-53 (1991); *Wainwright v. Sykes*, 433 U.S. 72 (1977) (a failure to comply with a state's contemporaneous objection rule at trial results in a procedural default).

Cause can be shown by the existence of "some objective factor external to the defense" such as interference by government officials, where the factual or legal basis for a claim was not reasonably available, or ineffective assistance of counsel.  *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  A petitioner demonstrates prejudice by establishing that the constitutional error "worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).  Absent cause and prejudice, a petitioner who shows that he is actually innocent can overcome the procedural hurdle as well.  *Murray*, 477 U.S. at 496.

## 1.  Failure to cure prosecutorial misconduct [Ground 11]

## 2.  Prosecutorial misconduct [Ground 12]

These grounds are combined for ease of discussion because Respondent argues that the same type of procedural default occurred with respect to each of these grounds.

In these grounds, Petitioner claims that he was denied a fair trial by the prosecutor's misconduct that occurred in the presence of the jury and the trial court, and that the trial court, likewise, deprived him of a fair trial by failing to cure the prosecutorial misconduct, even absent an objection by counsel.  Petitioner argued, on direct appeal, that the prosecutors engaged in misconduct, primarily during their closing remarks, by making improper and inflammatory

statements, to which "defense counsel[s' failure to] object could be considered a tactical decision" [Doc. 15, Add. 2, doc. 1 pp. 1073-1074]. Petitioner listed nineteen intemperate comments by the first prosecutor and two comments by the second prosecutor and he sought plain error review of all those comments [*Id*. at 1065, 1067-1071].

This claim was carried to the TCCA, which noted that Petitioner had failed to object during the prosecutor's closing argument; cited to Tennessee's waiver rule and to state law cases for the proposition that the waiver rule applies where no contemporaneous objection is made; explained that it could engage in plain error review even if an error whether "properly assigned or not;" and proceeded to conduct a painstaking review of the comments under the plain error doctrine. *Gann*, 251 S.W.3d at 458-463. But, as Respondent correctly points out, a plain error review of a claim does not dissipate a state court's finding that a procedural rule stands in the way of a full appellate review.

Here, the TCCA expressly concluded that Petitioner did not preserve his prosecutorial misconduct claim by objecting to the prosecutor's remarks during closing argument. *Gann*, 251 S.W.3d at 458. The TCCA reviewed the defaulted claim for plain error, discussed plain-error factors, including Petitioner's "substantial right," whether "substantial justice" called for consideration of the issue, and whether the plain error "probably changed the outcome of the trial." *Id*. at 458-59. The TCCA ultimately determined that, while the prosecutors' remarks were improper, those comments had no effect on the verdict. *Id.*at 462-63.

Since the TCCA clearly invoked a state procedural rule, then the plain error review conducted subsequently does not constitute a waiver of those state procedural default rules. *See Cooey v. Coyle*, 289 F.3d 882, 915 (6th Cir. 2002); *see also Hinkle v. Randle*, 271 F.3d 239, 244 (6th Cir. 2001) ("[W]e view a state appellate court's review for plain error as the enforcement of

a procedural default."). "Plain error analysis," according to the Sixth Circuit, "is more properly viewed as a court's right to overlook procedural defects to prevent manifest injustice, but is not equivalent to a review of the merits." *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006).

When a state invokes a procedural default defense, a federal court in the Sixth Circuit must make four determinations: (1) whether there is a procedural rule which applied to a petitioner's claim and whether a petitioner complied with the rule; (2) whether the procedural rule was actually enforced against a petitioner; (3) whether that rule is an adequate and independent state ground sufficient to block habeas review; and (4) whether a petitioner can demonstrate cause for his failure to comply with the rule and prejudice resulting from the alleged constitutional violation. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Beuke v. Houk*, 537 F.3d 618, 630 (6th Cir. 2008) (applying *Maupin*).

Tennessee has a rule providing that an issue is waived if not raised in an earlier proceeding where it could have been raised. *See* Tenn. Code Ann. § 40-30-106(g). The TCCA applied this rule to Petitioner's claim. Tennessee's waiver rule is an adequate and independent state ground sufficient to foreclose habeas review. *Hutchison v. Bell*, 303 F.3d 720, 738 (6th Cir. 2002). No cause and prejudice has been shown, and Petitioner's unexcused procedural default precludes federal habeas corpus review of Grounds 11 and 12.

## IV.    CONCLUSION

For the above reasons, this pro se state prisoner's application for a writ of habeas corpus will be **DENIED** and this case will be **DISMISSED**.

## V.    CERTIFICATE OF APPEALABILITY

Finally, the Court must consider whether to issue a certificate of appealability (COA) should Petitioner file a notice of appeal. A petitioner may appeal a final order in a § 2254 case

only if he is issued a COA, and a COA will be issued only where the applicant has made a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c). A petitioner whose claims have been rejected on a procedural basis must demonstrate that reasonable jurists would debate the correctness of the Court's procedural ruling. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Porterfield v. Bell*, 258 F.3d 484, 485-86 (6th Cir. 2001). Where claims have been dismissed on their merits, a petitioner must show reasonable jurists would find the assessment of the constitutional claims debatable or wrong. *See Slack*, 529 U.S. at 484.

After having reviewed each claim individually and in view of the firm procedural basis upon which is based the dismissal of most claims and the law upon which is based the dismissal on the merits of one claim, reasonable jurors would neither debate the correctness of the Court's procedural rulings nor its assessment of the claims. *Id.* Because reasonable jurists could not disagree with the resolution of these claims and could not conclude that they "are adequate to deserve encouragement proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), the Court will **DENY** issuance of a COA. 28 U.S.C. § 2253; Fed. R. App. P. 22(b).

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER**.


_____*/s/ Harry S. Mattice, Jr.*_____
HARRY S. MATTICE, JR.
UNITED STATES DISTRICT JUDGE